BOBBY WALRAVEN AND KATHERINE WALRAVEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Walraven v. Commissioner
Docket No. 2402-85.
United States Tax Court
T.C. Memo 1986-205; 1986 Tax Ct. Memo LEXIS 401; 51 T.C.M. (CCH) 1044; T.C.M. (RIA) 86205; May 21, 1986. John H. Trader, for the petitioners. Frank M. Schuler, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by statutory notice of deficiency dated October 31, 1984, determined deficiencies in petitioners' Federal income taxes in the amounts of $2,422, $2,231 and $2,493 for the taxable years 1980, 1981 and 1982, respectively. The deficiencies in income taxes are solely attributable to the meals, lodging and car expenses connected with Bobby Walraven's employment at the Callaway Nuclear Power Plant construction site (Callaway). The question for our consideration is whether Bobby Walraven's employment at Callaway was *402 temporary or of indefinite duration. If we find the employment to be temporary, petitioners may deduct the amounts claimed for meals, lodging and transportation for the taxable years 1980, 1981 and 1982. [1] Deductions for the expenditures in question would be pursuant to section 162. [2]
FINDINGS OF FACT Some of the facts have been stipulated and such facts, together with attached exhibits, are incorporated herein by this reference. Petitioners, at the time of filing of the petition herein, resided at Independence, Missouri. Petitioners filed joint U.S. Individual Income Tax Returns for the taxable years 1980, 1981 and 1982 with the Kansas City Service Center for Internal Revenue Service. Bobby Walraven (petitioner), through an apprenticeship-type progression beginning in 1948, became a journeyman lineman. *403 From 1948 through 1957 petitioner held various jobs which usually lasted less than one year, the longest of which was 14 months. On occasion, petitioner was unemployed. During 1957, petitioner began work with Evans Electric, which did exclusive contracting for the Independence Power and Light Company, which was owned and operated by the City of Independence, Missouri. During 1967 or 1968, the City of Independence "did away with [Evans Electric]" and petitioner began to work directly for Independence Power and Light (City). Petitioner worked a total of 20 years and 11 months in combination for Evans Electric or City (until 1978) as a lineman. During that period, petitioner established his domicile at Independence, missouri, and has lived in the same dwelling since 1961. Some of the work performed by journeyman wiremen and linemen are the same, but petitioner did not have specialized training as a wireman and until 1978 worked as a lineman, with the exception of a 3-month period. Petitioner's connection with the local union was as a lineman. Following a labor dispute, petitioner was terminated by City in August 1978. Shortly therafter, petitioner, through his union business *404 manager, found work as a wireman at Fort Leonard Wood, where he worked until November 1978. Petitioner believed that the labor dispute with City would abate and that he would eventually be rehired by City but he went to the union business manager who located work at Callaway, a nuclear power plant site near Fulton, Missouri, which was about 150 miles from petitioner's residence in Independence. Petitioner worked continuously at Callaway from November 1978 to May 1979, when he voluntarily quit. Petitioner quit his position at Callaway to take a position with Ford Motor Company nearer his home. During November 1979 (about 6 months later), petitioner was laid off by Ford Motor Company. Petitioner believed he had recall rights at Ford Motor Company for up to 2 years.In any event, petitioner returned to Callaway during November 1979 and worked without interruption until May 1983. Callaway was a major project being built by Union Electric Company. Daniel International Corporation (Daniel) was the general contractor for the job and Delcon Corporation, a subsidiary of Daniel, was electrical subcontractor at Callaway.All electrical workers at the Callaway project worked for Daniel through *405 Delcon. The Callaway project was subject to a project agreement between Daniel, Delcon and Local 257 of the International Brotherhood of Electrical Workers (IBEW).Union Electric Company was not subjected to the contract and it was understood that it could, at its sole option, terminate or suspend at any time any or all portions of the Callaway project. Additionally, the union agreement did not guarantee any employee 8 hours of work per day or 40 hours of work per week. Under the agreement, Daniel or Delcon would prepare a manpower request for a certain number of workers and the union would supply them from its referral list. Once employed, an electrician could be discharged through a reduction in force, for cause, or by voluntarily quitting. In the event of a reduction in force, seniority would not be considered and employees would be laid off based upon their placement in one of four categories, as follows: (A) Book 1 employees (local electricians who belonged to the IBEW Local 257); (B) Book 2 employees (journeyman linemen who came from other IBEW locals elsewhere in the United States); (C) Book 3 employees (union members who were grounds hands, linemen or one of various other *406 classifications); (D) Book 4 employees (nonunion electricians with appropriate experience who would be hired if no union electrician was available). Under the above agreement, Book 4 employees would be laid off first, then Book 3, and so on. The original plan for Callaway was to build two nuclear power generating units. Work was begun on the first unit late in 1975 and it was schedculed to be completed by October 1981. The second unit was scheduled for completion by April 1983. Dur to unforeseen problems, the estimated completion dates were extended several times. As of 1978, the estimated completion dates were October 1982 and April 1986 for the first and second units, respectively.In 1980, the first unit's estimated completion date was extended to April 1983. The revisions and extensions of completion dates were made public by Union Electric Company through various press releases and news conferences. During 1981, plans for construction of the second unit were canceled. Under the terms of the agreement, new workers were required to attend an orientation lecture about Callaway and they were informed of the current estimated time of completion of the project. The Callaway *407 project was approximately 40-percent complete as of November 1979, when petitioner began his second term of employment there. Prior to 1980 and continuing through the taxable years at issue, petitioner maintained membership in the IBEW Local 53 in Independence, Missouri. Petitioner's classification was that of journeyman lineman in Local 53. The Callaway project was under a union agreement with Local 257 of the IBEW, which was unable to supply the manpower for the Callaway project from its own membership. Throughout the period 1980 through 1983, members of other unions, including petitioner, were employed. Additionally, nonunion electricians were employed through the end of the 1982 year.Petitioner, while employed at Callaway, was a temporary member of Local 257 and during 1980, 1981 and 1982, Local 257 had approximately 150 of its own members working at Callaway. During the period November 1978 through May 1979, petitioner was classified as a Book 4 employee. During the period November 1979 through May 1983, petitioner was classified as a Book 3 employee. While at Callaway, petitioner was assigned to a crew which consisted of 7 to 10 tradesmen.On occasion, when a crew finished *408 a particular project, that crew would be disbanded and petitioner would be assigned to another crew. On some occasions, petitioner was assigned to jobs or crews which involved trades or skills outside of petitioner's basic discipline, e.g., welding. Petitioner's temporary work card with Local 257 was reissued regularly every 3 or 4 months. During the time petitioner worked at Callaway, he was "traveling out of class" which meant he was working as a wireman at Callaway even though he was a lineman. During the time petitioner worked at Callaway, 4 or 5 of his crew members were laid off. Generally, however, during the 1980 to 1983 period, between 322 and 577 electricians were employed at the Callaway project. Throughout the time petitioner worked at Callaway he was in contact, usually on a monthly basis, with his union business manager. Inquiries were made about jobs nearer to Independence. During 1981, petitioner made application for a position at Leeds Chevrolet, which was in the Independence area. Sometime during 1980, petitioner filed two different applications with City but he was not hired by City. On one occasion, petitioner's Local 53 business agent offered him a 2 or *409 3-week job in the Independence area, but petitioner declined the position. While on the Callaway project, petitioner lived in trailers, motels and, on one occasion, subleased an A-frame. Petitioner generally was transient, remaining in the Callaway project area during the week and going back to Independence on the weekends. Petitioner maintained all of his personal and social ties in Independence and did not permanently establish himself at Jefferson City or at the site of the project. Petitioner did not license vehicles, obtain telephone service, join religious or social organizations near the Callaway project. Petitioner generally would take his clothing and personal belongings back to Independence each weekend but left his tools at the Callaway work site. Following more than 42 months of continuous employment at the Callaway project, petitioner was laid off during May 1983. OPINION Our consideration in this case is limited to the question of whether petitioner's employment at Callaway was "temporary" or "indefinite." [3] Section 162(a)(2) would permit a deduction for lodging, meals and travel if incurred in connection with a trade or business while away from home. Generally, *410 a taxpayer's home for purposes of section 162(a) is the area or vicinity of his principal place of employment. . If a taxpayer leaves his principal place of employment on a temporary basis, his tax home may remain in the vicinity of his prior place of employment and he may be entitled to deductions for expenses while away from home under section 162(a). Temporary employment for purposes of applying this exception has been defined as that which can be expected to last for only a short period of time. . If, however, employment is not expected to terminate within a "fixed or reasonably short period of time" it will be considered indefinite. , affd. . *411 The temporary-versus-indefinite question is one of mixed fact and law to be resolved by applying the correct legal standard to the facts of the individual case. In , affg. , the standard was described as follows: "Where it appears probable that a taxpayer's employment outside the area of his regular abode will be for a 'temporary' or 'short' period of time, then his travel expenses are held to be deductible; conversely, if the prospects are that his work will continue for an 'indefinite' or 'intermediate' or 'substantially long' period, then the deduction is disallowed." * * * [, quoting .] In , the standard in Cockrel was further refined as follows: Cockrell demands that a court investigate the taxpayer's prospects of continued employment. In other words, a court must evaluate those facts available to a taxpayer at a point in time and determine, in light of those facts, whether future employment *412 was for a temporary or indefinite period. * * * Applying these tests, we conclude that respondent's determination must be sustained, and that petitioner's employment at Callaway during the taxable years 1980, 1981 and 1982 was indefinite rather than temporary in nature. In arriving at this conclusion, we take into account the following factors which are supported by the record: (1) The Callaway project was a major one and petitioner was made aware of its proposed completion date upon his orientation and entry into the project on two different occasions. Additionally, announcements of extensions of time within which the first nuclear unit was to be completed were made public by Union Electric Company. (2) During the period of time that petitioner was employed at Callaway, the number of electricians on the project varied at approximately 300 to 500 and Local 257, of which petitioner was a temporary member, only had 150 electricians within its regular membership. There was, accordingly, a regular and continuing need for electricians at the project during the entire time under consideration.(3) During the period in question, petitioner was a Book 3 employee which entitled him to some *413 priority over Book 4 employees in the event of a reduction in force. And, even a nonunion electrician could only be fired for cause, by reduction in force or by voluntarily quitting. The work at the Callaway project was not seasonal in nature and, but for petitioner's decision to quit in May 1979 to work for Ford Motor Company, he may have continually been employed at Callaway from November 1978 through May 1983. (4) Petitioner was not interested in short-term jobs in the Independence area (2 or 3-week positions) because he wished longer-term employment.It appears that petitioner was not willing to accept anything other than permanent-type employment in the Independence area and from this we can reasonably assume that he expected this position at Callaway to be something other than short-term. Respondent's position is that this case does not differ significantly from six prior "Callaway cases" heard by this Court. ; ; ; ; ; *414 . Respondent relies most heavily upon , since Mr. Nulsen was a nonunion electrician and worked at Callaway as a Book 4 employee for a period of time similar to petitioner (Mr. Nulsen worked from November 26, 1979, until April 9, 1982). Respondent points out that under the terms of the project agreement, Mr. Nulsen would have been laid off before petitioner since Mr. Nulsen was a Book 4 employee and petitioner was listed under Book 3. Petitioner cites a number of cases, attempting to distinguish himself from the six prior employees of Callaway who were unsuccessful in their cases before this Court. Petitioner argues that Union Electric Company could have terminated the project at any time at its sole option and that, further, the project agreement did not guarantee any employee 8 hours of work per day or 40 hours of work per week. Additionally, petitioner, in his testimony, emphasized that his living conditions in the Callaway project area were always transient and temporary and that he never acquired any permanent residence or domiciliary in the project area.Petitioner's *415 emphasis of this point misses the mark because the test is not whether it was reasonable for the taxpayer to move his home closer to the job site. It is the job itself and its expected duration that is crucial. . Petitioner cites four Memorandum Opinions of this Court and a District Court case that he advances in support of a holding that his employment was temporary. In , it was held that the employment of an eletrician working at a nuclear power plant was temporary. The facts of , are distinguishable because in Williams the first of two nuclear reactors had been completed and the second one was under construction. Additionally, there was some question when the taxpayer was on the job as to whether the second nuclear power plant would ever be completed and placed in operation. Even more directly, in Williams, 6 months after the taxpayer began work, a very large layoff of electricians occurred; at one point, work on the second nuclear reactor was stopped for cash-flow problems and *416 there was a gradual and continual decline in the number of electricians being maintained on the project. Unlike Williams, petitioner's actual experience with layoffs of electricians was limited and the number of electricians employed showed no signs of decreasing. The remaining cases cited by petitioner are inapposite and involve circumstances substantially dissimilar to the facts of this case. Based upon the facts of this case, petitioner's prospects for continued employment at Callaway for an indefinite period were excellent. Considering the size of the project and the demand for workers (which was far beyond the local union's ability to supply) it would have been unreasonable for petitioner to have concluded otherwise.We find this case materially indistinguishable from prior precedents involving Callaway employees and, accordingly, respondent's determination is sustained. Decision will be entered for the respondent.
Footnotes
1. At the trial, respondent conceded that petitioner had fully substantiated the amounts in question and that, accordingly, the amounts claimed would be fully deductible if we determine that Mr. Walraven's employment at Callaway was temporary. ↩
2. All statutory references herein are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. Respondent has not raised and, accordingly, we do not consider any question of commuting between the taxpayer's residence and his job site. See , vacated and remanded on respondent's motion by unpublished order (2d Cir., Mar. 21, 1972); .↩